FILED
2016 Sep-29  PM 03:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **DANA HICKMAN and ROBBIN N. HINES,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **CIVIL ACTION NO.: _____** |
| **SPIRIT OF ATHENS ALABAMA, INC.,** | ) ) ) | |
| **Defendant.** | ) ) | |

## COMPLAINT

COME NOW, Dana Hickman and Robbin Hines, Plaintiffs in the above-styled action, and file their Complaint against Spirit of Athens Alabama, Inc., Defendant in the above-styled action, and, in support thereof, would show as follows:

### INTRODUCTION

Spirit of Athens (SoA) is a non-profit corporation focused on economic development, and promoting tourism for the city of Athens, Alabama. SoA receives annual grants from state and local governments and also from federal sources such as the Tennessee Valley Authority. Earlier this year, SoA hired Dana Hickman to replace outgoing Executive Director, Trisha Black. Soon after she arrived, Ms. Hickman hired Robin Hines and together they began planning events

1

and formulating budgets. They soon uncovered a number of the fiscal problems including that over half of SoA's 2015 funds were used to pay unspecified "other expenses." When Ms. Hickman and Ms. Hines sought to clarify the journal entry, they were refused access to SoA's check register by its bookkeeper.

The two women reported the financial irregularities to Executive Board members, Doug Gates and Tony McCormack. When nothing was done to correct the accounting problems, Ms. Hickman refused to sign SoA's 2015 tax returns.

Soon after SoA filed its 2015 tax returns, one of the members of the general Board of Directors and the Chairman of the Limestone County Commission expressed concerns about SoA's fiscal responsibility and transparency. The member and the Chairman requested that Ms. Hines and Ms. Hickman compile and deliver certain financial materials to them. At that point, Ms. Hickman and Ms. Hines decided to hire an outside auditing firm to perform an audit and compile the requested records.

Upon learning this, Mr. Gates terminated the auditor and he and Mr. McCormack fired Ms. Hines and Ms. Hickman before they could deliver the records requested of them to the Board and the County Commission. These two women were attempting to bring transparency and accountability to this non-profit corporation that receives federal and other funds and they were fired for it.

## PARTIES

1.      Plaintiff Dana Hickman is a female above the age of nineteen (19), a citizen of the United States and resident of this district and division. She is a former employee of Defendant Spirit of Athens Alabama, Inc.

2.      Plaintiff Robbin Nicole Hines is a female above the age of nineteen (19), a citizen of the United States and resident of this district and division. She is a former employee of Defendant Spirit of Athens Alabama, Inc.

3.      Defendant Spirit of Athens Alabama, Inc. ("SoA") is a domestic non-profit corporation formed on August 18, 2006 and located in Athens, Alabama.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under federal law, in particular the federal FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.* In addition, the FCA itself, at 31 U.S.C. § 3732(a), specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730(h).

5.      This court has personal jurisdiction over Defendant as it can be found in, and is authorized to transact business in, the Northern District of Alabama.

6.      Venue is proper in the Northern District of Alabama under 31 U.S.C. § 3730(h) and 28 U.S.C. § 1391, as SoA conducts business in this District and the acts proscribed by 31 U.S.C. § 3730(h) occurred in this District.

### FACTS

### Spirit of Athens Alabama, Inc. and the Tennessee Valley Authority

7.      Plaintiffs repeat paragraphs 1 through 6 as if fully set out herein.

8.      Spirit of Athens is a non-profit corporation focused on economic development, historical preservation, and promoting tourism for the city of Athens, Alabama.

9.      It seeks to accomplish the goals of bringing jobs, dollars, and people back to Alabama's historic communities through a series of annual events and promotions extolling the virtues of Athens' community, people, and heritage.

10.     It pays for these activities through sustaining commitments and grants from a variety of state, local and federal governmental agencies as well as private and organizational donors.

11.     Among other sources of funding, SoA receives annual grants from a federal entity, the Tennessee Valley Authority (TVA).

12.     With the signing of the original Tennessee Valley Authority Act by President Roosevelt in 1933, codified at 16 U.S.C. § 831 (TVA Act) , Congress charged TVA with ensuring the economic, environmental, social, and physical

wellbeing of the people in its service area. It finances its operations using proceeds earned from the sale of power and borrowings. 16 U.S.C. §§ 831n-4, 831y. The TVA Act requires that TVA charge rates for power that will produce sufficient revenues to provide funds for operation, maintenance, administration and other specified costs. 16 U.S.C. § 831n-4(f). TVA deposits revenues into the TVA Fund. The Act, however, requires TVA to transfer to the U.S. Treasury any amounts excess to its operational needs. 16 U.S.C. § 831y.

13.    In addition to supplying electric power to customers in seven states, TVA's activities today continue to play important roles in improving the region's quality of life.

14.    TVA proactively contributes to educational programs and competitions focused on STEM and robotics, nonprofit organizations delivering disaster relief and helping meet basic needs, and civic activities specifically important to TVA's core business objectives and key stakeholders.

### Creation of the 2015 Tax Returns

15.    Plaintiff Dana Hickman began working at SoA as the Executive Director on January 21, 2016. At the time of her hiring, she enjoyed an outstanding reputation for competence and integrity having over 30 years of experience working in the business administration field.

16.     Ms. Hickman replaced the outgoing Executive Director, Trisha Black.

17.     Ms. Black's husband, Shane Black, was on the Board of Directors during his wife's tenure as the Executive Director and he remained on the Board after Ms. Hickman's hire.

18.     At the time of Ms. Hickman hire, documents had not yet been delivered to the organization's accountant, Doug Logan, CPA, to prepare SoA's 2015 federal and state tax returns. The IRS already had questions about the 2013 and 2014 tax returns and had revoked SoA's non-profit (501(c)3) status.

19.     In anticipation of completing this task, Ms. Hickman set a meeting with Mr. Logan and Ms. Black.

20.     In the course of gathering documents necessary for the meeting, Mr. Logan asked Ms. Hickman to obtain financial information from SoA's board member and bookkeeper, Wyn Heisler. In compliance with this request, Ms. Hickman called Ms. Heisler and asked for SoA's financial information.

21.     Curiously, Ms. Heisler told Ms. Hickman that the organization's financial records, including SoA's check register, were kept at her residence and not SoA's place of business.

22.     More troubling, Ms. Heisler refused to provide the financial documents, including SoA's check register, to Ms. Hickman.

23. Ms. Hickman called Mr. Logan to tell him of Ms. Heisler's decision. Ms. Hickman explained that she was surprised that she, as the Executive Director, was not allowed to see the organization's check register.

24. The following day, Ms. Heisler came to SoA's offices and informed Ms. Hickman and Ms. Hines that she would not be giving over any of SoA's accounting records as she was not ready to do so. Moreover, she thought such an action was unnecessary.

25. When Ms. Hickman told Mr. Logan of Ms. Heisler's statements at the office, he replied that he did not wish to ask for the financial information himself.

26. When Ms. Hickman questioned Mr. Logan on this, he explained that Ms. Heisler was his neighbor and that he was afraid that their relationship might become contentious if he pressed her to hand over possession of SoA's books and financial records.

### Plaintiffs Inform SoA's Board of Directors of Financial Irregularities

27. Ms. Hickman reported Ms. Heisler's refusal to former Board President Tony McCormack and the current Board President Doug Gates.

28. Nothing was done. The books were never delivered to Mr. Logan.

29. On April 14, 2016, Mr. Logan met with SoA's Board of Directors. He explained that he had been unable to prepare returns as he lacked records including the organization's check register which was being kept at Ms. Heisler's home.

30.    Mr. Logan recommended that, in the future, all accounting records should be returned to the SoA office and that monthly bills should be paid on time to avoid the many delinquencies and reconnection fees paid in 2015.

31.    Mr. Logan told the Board he would prepare late tax returns.

32.    Robbin Hines joined SoA's Board of Directors in November 2015. She attended regular meetings, but was not made privy to much of SoA's financial dealings or accounting practices.

33.    After Mr. Logan's April 2016 meeting with SoA's Board, Ms. Hickman hired Ms. Hines later that month. They were the only two employees.

34.    Soon after Ms. Hines was hired, she and Ms. Hickman began to pull certain membership records and compile specific financial information in order to set fundraising goals for the coming year.

35.    In the process, Ms. Hines found troubling financial discrepancies and brought them to Ms. Hickman's attention. Together, Ms. Hickman and Ms. Hines reported their concerns to the Board President Gates.

36.    In May 2016, Mr. Logan contacted Ms. Hickman to sign for and pick up SoA's completed 2015 tax returns.

37.    Ms. Hickman signed for the returns which documented total revenue of $113,019.00. However, when she began examining them she noted that more than half of this, sum $60,890.00, was categorized as "other expenses."

38.   Due to this large amount of non-attributed expenses, Ms. Hickman retracted her signature the following morning and explained to Mr. Logan that she did not feel comfortable signing the returns as they were based on less-than-complete information created when Ms. Black was the Executive Director.

39.   Doug Gates signed SoA's 2015 state and federal tax returns despite the fact that same were prepared without adherence to generally accepted accounting principles due, in part, to Ms. Heisler's refusal to provide the organization's check register, which would have identified the recipient(s) of over half of SoA's total annual revenue.

40.   A few weeks later, in June 2016, Ms. Hickman called a meeting with SoA's Executive Board: former President Tony McCormack, current President Gates, and incoming 2017 President Laurie Glenn.

41.   Ms. Hickman and Ms. Hines presented the budget from Trisha Black's 2015 tenure as a starting point for the 2016 budget.

42.   During this meeting, Ms. Hickman and Ms. Hines reiterated the problems Mr. Logan had experienced in creating the 2015 tax returns without the benefit of the documents located at Ms. Heisler's home. Ms. Hickman also explained the problem associated with the unaccounted-for expenses and the fact that she had refused to sign the returns as drafted.

43.   Ms. Hickman and Ms. Hines asked permission to present the 2015 tax returns at the next full Board meeting and to discuss Ms. Heisler's refusal to provide financial records.

44.   A few weeks later, on Thursday, July 14, 2016, Ms. Hickman and Ms. Hines attended the SoA Board of Directors' meeting. Each Board member was given a copy of SoA's 2015 tax return.

45.   At this meeting, the tax returns were not discussed.

46.   At this meeting, the matter of Ms. Heisler returning financial records, including the check register, to SoA's office was not discussed.

### Plaintiffs Receive Requests for Financial Records

47.   A few days later, on Sunday, July 17, 2016, after the full Board meeting where the 2015 tax returns were distributed, an SoA Board member, Teresa Todd, emailed Ms. Hickman regarding the 2015 SoA tax return she had been given and requested that Ms. Hickman and Ms. Hines provide her the past seven (7) years of tax returns to review.

48.   On Monday, July 18, 2016, while Ms. Hickman and Ms. Hines were looking for the tax returns to fulfill Ms. Todd's request, Limestone County Commission Chairman, Mark Yarbrough, emailed Ms. Hickman and requested SoA's accounting information for the previous two (2) years. Chairman Yarbrough asked that he receive the records on or before Friday, July 29, 2016.

49.    After an extensive search, Ms. Hickman and Ms. Hines could find no tax returns, other than 2015, in SoA's offices to provide to Ms. Todd.

50.    Ms. Hickman and Ms. Hines were beginning to realize that significant financial/accounting irregularities had occurred within the organization.

### Outside Auditor is Hired

51.    Knowing that she had to conduct her own investigation, Ms. Hickman met with Bobby Boyd of Yeager & Boyd, LLC in Birmingham, Alabama on Thursday, July 21, 2016.

52.    In her capacity as the Executive Director of SoA, Ms. Hickman retained the firm of Yeager & Boyd, LLC to conduct an audit of SoA.

53.    It was Ms. Hickman's hope that such an audit would accomplish the goal of financial transparency that she had, to this point, been unable to attain.

54.    The following Tuesday morning, July 26, 2016, Ms. Hickman emailed SoA President Gates informing him that due to the lack of financial transparency and requests for such from the two members of the Board of Directors, she had retained Yeager & Boyd to conduct an audit of SoA. In this email, she also informed him that Chairman Yarbrough had requested that certain financial records for the organization be turned over to him by the end of the week.

## The Auditor and Plaintiffs are Fired

55.     Later that day, Mr. Boyd from Yeager & Boyd called Ms. Hickman to inform her that he had received a call from President Gates who had overridden Ms. Hickman's decision to retain their firm to perform an audit. Mr. Boyd informed her that President Gates had terminated the retention of Yeager & Boyd.

56.     After this phone call, Mr. Gates emailed Ms. Hickman and explained that there would be a meeting at Mr. Black's office on Thursday where she could come and express her concerns. In response, Ms. Hickman explained she had already expressed her concerns several times and stated she preferred to not to attend the meeting, but, rather, would like to meet with the full Board of Directors.

57.     On Thursday, July 28, 2016, Tony McCormack called Ms. Hickman and asked her to meet him at the SoA office.

58.     When she arrived, Doug Gates and Ms. Hines were also there. Without preamble or reason provided, Mr. Gates and Mr. McCormack fired Ms. Hickman and Ms. Hines.

59.     Mr. McCormack and Mr. Gates terminated Plaintiffs, and the outside auditor they retained, in an effort to conceal that SoA had misused and/or mismanaged funds, at least some of which constituted funds from the federal government via one or more grants provided by TVA.

60.   Further, Mr. McCormack and Mr. Gates terminated Plaintiffs, and the outside auditor they retained, in an effort to conceal that SoA's tax returns were drafted with insufficient information.

61.   Plaintiffs were in the process of assisting an outside auditor to shed light on SoA's fiscal affairs.

62.   Plaintiffs were in the process of compiling documents necessary to satisfy the requests of not only conscientious Board members, but also a concerned community leader.

63.   Plaintiffs were terminated because they were attempting to determine how the organization's funds were spent and to bring much-needed transparency to the SoA.

64.   As laid out more fully below, the terminations of Plaintiffs were wrongful inasmuch as they were done in violation of federal law and certain employment laws as they constitute illegal retaliation for attempting to fulfill their duties as stewards of federal dollars.

65.   Plaintiffs attempted to uncover the truth and they were fired for it.

COUNT

**Violation of the Retaliation Provisions of the
False Claims Act, 31 U.S.C. § 3730(h)**

66.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 65 above, as if fully set forth herein.

67.    Plaintiffs seek redress for Defendant's employment practices.

68.    Defendant is an employer and receives federal funds within the meaning of that term under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

69.    Plaintiffs are employees that engaged in lawful acts as their investigations, inquiries, and attempts to secure an audit and to determine the propriety and nature of SoA's expenses which were directed at exposing a potential fraud upon the government for failing to account for the expenditure of federal dollars via the TVA grant and constitute protected conduct with the meaning of 31 U.S.C. § 3730(h) (the "Protected Conduct").

70.    Plaintiffs made numerous internal complaints regarding actions by Wyn Heisler and others which they believed were potentially exposing the organization to civil and/or criminal liability for hiding or concealing the true recipients of federal dollars via the TVA grant.

71.    Defendant knew that Plaintiffs had engaged in and were in the process of engaging in Protected Conduct.

14

72.   Plaintiffs were terminated near, in terms of time, as to when SoA, through its agent employees and members of its Board of Directors, first learned of Plaintiffs' Protected Conduct.

73.   The temporal relation between Defendant first learning of Plaintiffs' Protected Conduct and Plaintiffs' termination support a reasonable conclusion that the organization was aware of the possibility of litigation under the False Claims Act and other federal statutes and regulations.

74.   Plaintiffs were terminated because they hired an outside auditor and were in the process of providing information which would have revealed that SoA, through its agent employees and members of its Board of Directors, knowingly made or caused to be made false records and/or statements material relative to the appropriate accounting for certain federal funds. There was not another reason for Plaintiffs' termination other than their engagement in Protected Conduct.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter an Order, pursuant to, *inter alia*, 31 U.S.C. § 3130(h)(2), for judgment and relief against Defendant as follows:

a) Accepting jurisdiction over this matter;

b) Declaring that Defendant engaged in conduct unlawful under 31 U.S.C. § 3730(h);

c) Entering an Injunction requiring Plaintiffs be reinstated with the same seniority status that they would have had but for the above-pled retaliation;

d) Awarding Plaintiffs their back pay, as calculated, times two;

e) Awarding Plaintiffs interest on their back pay award;

f) Awarding Plaintiffs compensatory damages;

g) Awarding Plaintiffs pre- and post-judgment interest as allowed by law;

h) Awarding Plaintiffs all litigation costs incurred, including reasonable attorney fees; and

i) Awarding Plaintiffs such other, different and further relief, including equitable, as this Court deems just and proper.

16

## JURY DEMAND

Plaintiffs demand trial by jury on all issues triable at law.

Dated this the _28_ day of September, 2016.

Dennis A. Mastando (ASB-0893-X32B)
Eric J. Artrip (ASB-9673-I68E)
MASTANDO & ATRIP, LLC
301 Washington Street NW, Suite 302
Huntsville, AL 35801
Phone:      (256) 532-2222
Fax:          (256) 513-7489
tony@mastandoartrip.com
artrip@mastandoartrip.com


## DEFENDANT TO BE SERVED AT THE FOLLOWING ADDRESS:

Spirit of Athens Alabama, Inc.
107 North Jefferson Street
Athens, AL 35611