UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| DANA HICKMAN and ROBBIN N. HINES, | }<br>}<br>} |
| Plaintiffs, | }<br>} Case No.: 5:16-cv-01595-MHH |
| v. | }<br>} |
| SPIRIT OF ATHENS ALABAMA, INC., | }<br>}<br>} |
| Defendant. | } |

## MEMORANDUM OPINION

Defendant Spirit of Athens, Alabama, Inc. is a 501(c)(3) non-profit corporation that provides economic development services to the city of Athens, Alabama. Plaintiff Dana Hickman served as the executive director for Spirit of Athens, and plaintiff Robbin Hines served as Ms. Hickman's assistant until Spirit of Athens terminated both of the plaintiffs. The plaintiffs allege that Spirit of Athens terminated them because they voiced concerns about the organization's misuse of funds. Ms. Hickman and Ms. Hines bring this action against Spirit of Athens under the False Claims Act's anti-retaliation provision. 31 U.S.C. § 3730(h).

"Liability under the False Claims Act arises from the submission of a fraudulent claim to the government" of the United States. *Corsello v. Lincare,*

1

*Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005). "Indeed, the 'central question' regarding whether a relator's allegations state a claim [] is, did the defendant present (or caused to be presented) to the government a false or fraudulent claim for payment?" *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015) (quoting *Hopper v. Solvay Pharm., Inc.*, 586 F.3d 1318, 1326 (11th Cir. 2009)). In a motion to dismiss that it filed shortly after the plaintiffs filed their complaint, Spirit of Athens argued that it could not be sued under the False Claims Act because the corporation does not receive federal funds. (Doc. 6, p. 1). The Court denied Spirit of Athens's motion but ordered the parties to engage in limited discovery concerning the extent to which Spirit of Athens receives federal funds. (Doc. 16).

Based on the information that the parties gathered during discovery, Spirit of Athens has renewed its argument. Spirit of Athens asks the Court to enter judgment in its favor pursuant to Rule 56 of the Federal Rules of Civil Procedure, arguing again that it is not subject to suit under the FCA. (Doc. 28). For the reasons discussed below, the Court finds that the plaintiffs cannot maintain their retaliation claim against Spirit of Athens because the plaintiffs have not engaged in activity that is protected under the FCA.

## I. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party. *Asalde v. First Class Parking Sys. LLC*, 898 F.3d 1136, 1138 (11th Cir. 2018). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

## II. FACTUAL BACKGROUND

Spirit of Athens is a non-profit corporation tasked with revitalizing downtown Athens, Alabama. (Doc. 25-1, p. 13; Doc. 25-2, p. 7, tp. 23; Doc. 27-9, p. 7, tp. 23). Spirit of Athens receives funding from the City of Athens; Limestone County, Alabama; TVA "in-lieu-of-taxes" funds; and membership dues. (Doc. 27-

9, p. 7, tpp. 22-23; Doc. 27-1, p. 8, tp. 26; Doc. 26-6, pp. 7, 15 (2014 tax return); Doc. 26-7, pp. 9, 32 (2015 tax return)).

TVA "in-lieu-of-taxes" funds are funds that the Tennessee Valley Authority or TVA provides to states in which the TVA operates. The TVA is a federal corporation. 16 U.S.C. § 831. It is "the nation's largest government-owned power provider," supplying "electricity to local power companies and to large, energy-intensive industrial customers and federal facilities." "Energy," *Tennessee Valley Authority, available at* https://www.tva.gov/About-TVA/TVA-at-a-Glance (last accessed Feb. 22, 2019). According to the TVA's website, the corporation is self-funded:

> Initially, federal appropriations funded all TVA operations. Federal funding for the TVA power program ended in 1959, and appropriations for TVA's environmental stewardship and economic development activities were phased out by 1999. In 2014, TVA made its final scheduled repayment on Congress' original $1 billion investment in the TVA power system, but TVA continues to make annual payments on the government's remaining equity investment in TVA.
>
> TVA is now fully self-financing, funding virtually all operations through electricity sales and power system bond financing. TVA sets rates as low as feasible and reinvests net income from power sales into power system improvements and economic development initiatives. TVA makes no profit and receives no tax money.

"How We're Funded," *Tennessee Valley Authority, available at* https://www.tva.gov/About-TVA/TVA-at-a-Glance (last accessed Feb. 22, 2019).

Rather than paying taxes on the income that it derives from sales of electricity, "to render financial assistance to those States and local governments in which the power operations of the Corporation are carried on and in which the Corporation has acquired properties previously subject to State and local taxation," the TVA provides a "percentage[] of the gross proceeds derived from the sale of power by the Corporation for the preceding fiscal year . . . , together with such additional amounts as may be payable pursuant to the provisions" of 16 U.S.C. § 831*l*, "said payments to constitute a charge against the power operations of the Corporation." 16 U.S.C. § 831*l*. The payments that the TVA makes under § 831*l* are "in lieu of taxation, and the Corporation, its property, franchises and income, are expressly exempted from taxation in any manner or form by any State, county, municipality, or any subdivision or district thereof." 16 U.S.C. § 831*l*.

The State of Alabama receives "in-lieu-of-taxes" funds from the TVA. The state divides this money among the Alabama counties in which the TVA operates. ALA. CODE. § 40-28-2 (1975).[1] By act of the Alabama Legislature, Spirit of

---

[1] Ala. Code § 40-28-2 reads in relevant part:

(a) Beginning in the fiscal year ending September 30, 1980, the State of Alabama will annually transfer to the counties in Alabama served by T.V.A. a portion of the in-lieu-of-taxes payments made by T.V.A. to the State of Alabama.

. . .

(b) The state shall distribute the in-lieu-of-taxes payments each fiscal year to each of the counties served by the T.V.A., and the three percent increases after September 30, 2005,

5

Athens receives $5,000 in TVA "in-lieu-of-taxes" funds annually. (Doc. 27-1, p. 11, tpp. 39-42; Doc. 27-1, p. 49 (in pp. 45-51); Doc. 27-1, p. 56 (in pp. 52-62)). Spirit of Athens's 2014 federal tax return indicates that Spirit of Athens received "in-lieu-of-taxes" funds directly from the TVA. (Doc. 26-6, p. 15).[2] Other documents in the record indicate that Limestone County received "in-lieu-of-taxes" funds from the TVA, and then the county dispersed TVA funds to Spirit of Athens. (*See* Doc. 27-1, pp. 63, 66, 73, 79, 86, 93).

In January of 2016, Spirit of Athens hired Dana Hickman as its executive director. (Doc. 27-1, p. 5, tp. 13). A few months later, Spirit of Athens hired Robbin Hines to assist Ms. Hickman. (Doc. 27-3, p. 5, tpp. 13-14). When Ms. Hickman arrived at Spirit of Athens, the organization was experiencing financial difficulties. The IRS had questions about Spirit of Athens's 2013 and 2014 tax returns and had revoked Spirit of Athens's 501(c)(3) status. (Doc. 27-6, p. 13, tp. 47; *see also* Doc. 1, p. 6, ¶ 18).[3] As she began gathering documents for Spirit of Athens's accountant to prepare the corporation's 2015 federal and state tax returns,

---

        generated by the amendments to this section at the 2006 Regular Session of the Legislature shall be allocated by local legislation.

[2] Doc. 26-6, p. 43 seems to be a duplicate of Doc. 26-6, p. 15. Both pages indicate that Spirit of Athens received funds directly from the TVA.

[3] The Court relies in part on the factual allegations in the complaint because to date, at the Court's direction, the parties have engaged in discovery only with respect to the nature of the TVA funds that Spirit of Athens received. Therefore, the Court accepts as true the plaintiffs' allegations concerning matters beyond the scope of the parties' limited discovery.

Ms. Hickman became concerned about financial discrepancies and irregularities that she observed. (Doc. 1).

While the plaintiffs worked for Spirit of Athens, Spirit of Athens received one check from Limestone County for TVA in-lieu-of-taxes funds. (Doc. 27-1, pp. 8-9, tpp. 28-29; Doc. 27-3, p. 6, tpp. 18-19). Ms. Hines testified that while she and Ms. Hickman worked for Spirit of Athens, she heard that the TVA funds were federal funds. (Doc. 27-3, p. 8, tpp. 27-28). According to Ms. Hines, Jason Black, a Limestone County Commissioner, once stated that Spirit of Athens was to receive "some federal money from the TVA, we should be getting it soon, and not to feel bad that [the Commission] didn't vote for us to get money from the County for [an upcoming event] because we should be getting some federal money soon from TVA, and we could use that for [the event] because it is putting it back into the community." (Doc. 27-3, p. 9, tpp. 29-30). Later Ms. Hines "[g]oogled TVA in lieu of tax," and found that this "was federal money." (Doc. 27-3, p. 9, tp. 30). Ms. Hines then "just assumed that it was [federal money]." (Doc. 27-3, p. 9, tp. 34).

Ms. Hickman also believed the TVA funds were federal funds. (Doc. 27-1, p. 10, tp. 33). Ms. Hickman stated: "when we receive a check that says in lieu of tax TVA, that spells to me federal money." (Doc. 27-1, p. 10, tp. 36). Ms. Hickman explained: "[I] was associated with other ladies who were directors in

7

this community or in our town … [and they] said that they received [TVA in-lieu-of-taxes] moneys, too. … [T]hey told me that it was federal money, so that's why I know that this is federal money." (Doc. 27-1, p. 27, tp. 101).

Ms. Hickman testified that Spirit of Athens could use the TVA funds "for anything that was within our scope of what we were going to do." (Doc. 27-1, p. 9, tp. 30). To Ms. Hickman's knowledge, the TVA did not restrict the use of the in-lieu-of-taxes funds, and the TVA did not require an accounting of the funds after the TVA disbursed the funds. (Doc. 27-1, p. 9, tpp. 30-31). To Ms. Hickman's knowledge, Spirit of Athens did not submit a written request to the TVA for the in-lieu-of-taxes funds that the corporation received. (Doc. 27-1, pp. 9-10, tpp. 32-33). Ms. Hickman testified: "No. The way that all worked was that it was the law and it was – TVA would distribute the money to Spirit of Athens. So it wasn't something we had – that I had any – to go back to fill out any paperwork to say we are needing this money, we are asking for appropriations for that." (Doc. 27-1, pp. 9-10, tpp. 32-33). Ms. Hickman understood that the TVA "issued [in-lieu-of-tax payments] to Limestone County and it was held in an escrow for them to distribute to Spirit of Athens." (Doc. 27-1, p. 10, tp. 33).

At about the same time that Spirit of Athens received the 2016 installment of TVA funds, Spirit of Athens's accountant asked Ms. Hickman to sign Spirit of Athens's 2015 tax returns. (Doc. 1, p. 8, ¶ 36). Ms. Hickman signed the returns.

Later, when she noticed that more than half of Spirit of Athens's total revenue was categorized as "expenses," she retracted her signature. (Doc. 1, pp. 8-9, ¶¶ 37-38). When Ms. Hickman and Ms. Hines presented the 2016 budget for Spirit of Athens to the organization's board of directors, Ms. Hickman "explained the problem associated with the unaccounted-for expenses and the fact that she had refused to sign the returns as drafted." (Doc. 1, p. 9, ¶¶ 40, 42).

Ms. Hickman hired an auditor with hopes of "accomplish[ing] the goal of financial transparency." (Doc. 1, p. 11, ¶ 53). She let the board president, Mr. Gates, know that "due to the lack of financial transparency," she had retained an auditor. (Doc. 1, p. 11, ¶ 54). But the board president fired the auditor and fired Ms. Hickman and Ms. Hines "[w]ithout preamble or reason provided." (Doc. 1, p. 12, ¶¶ 57-58).

## III. DISCUSSION

The financial irregularities that Ms. Hickman and Ms. Hines observed at Spirit of Athens are concerning, but to give rise to a claim for retaliation under the FCA, those irregularities must involve a particular type of fraud. For more than 150 years, the False Claims Act has been the federal government's primary tool for combatting fraud perpetrated against it. 31 U.S.C. §§ 3729-3733; *see also* S. Rep. No. 345, at 34 (1986) *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299. Congress enacted the statute in 1863 to address "massive frauds" by government contractors

9

during the Civil War. *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1996 (2016). In 1863, the record before Congress indicated, for example, that contractors were billing the United States for goods that the contractors had not actually provided. 136 S. Ct. at 1996.

Since 1863, Congress has amended the FCA a number of times to expand the scope of the statute's coverage, but the Act's focus "remains on those who present or directly induce the submission of false or fraudulent claims" for payment to the United States, 136 S. Ct. at 1996, and those who submit "a false record or statement" to the United States to avoid "an obligation to pay or transmit money or property" to the United States, 31 U.S.C. § 3729(a)(1)(G). In the words of the Eleventh Circuit Court of Appeals, the "submission of a false claim is 'the *sine qua non* of a False Claims Act violation.'" *United States v. HPC Healthcare, Inc.*, 723 Fed. Appx. 783, 789 (11th Cir. 2018) (quoting *US ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)); *Urquilla-Diaz*, 780 F.3d at 1045 (same).

The FCA contains an anti-retaliation provision. That provision makes whole an "employee, contractor, or agent" who suffers a retaliatory employment action because the employee engaged in "lawful acts" to try to prevent a violation of the FCA. 31 U.S.C. § 3730(h).[4] This "whistleblower" provision "ensure[s] that

---

[4] Section 3730(h) provides:

10

individuals who investigate and report their employers' violations of the FCA will not face adverse employment consequences." *McCrary v. Knox Cty., Ind.*, 200 F. Supp. 3d 782, 790 (S.D. Ind. 2016). But the anti-retaliation provision applies only to FCA violations. Because the FCA does not "reach every kind of fraud practiced on the [United States] Government," *United States v. McNinch*, 356 U.S. 595, 599 (1958), the FCA's anti-retaliation provision does not provide a remedy for every act undertaken to prevent fraud that may relate in some way to government funds. Accordingly, for purposes of an FCA retaliation claim, a plaintiff's protected activity necessarily must address conduct that could constitute an FCA violation.[5]

Borrowing principles from other types of retaliation litigation, to establish that they engaged in protected activity in this case, Ms. Hickman and Ms. Hines

---

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

[5] To establish a prima facie case of retaliation under the FCA, an employee must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of the protected activity; and (3) the employer subjected the employee to retaliation because of her protected conduct. *Mack v. Augusta-Richmond Cty., Ga.*, 148 Fed. Appx. 894, 896-97 (11th Cir. 2005). "Section 3730(h) 'protects an employee's conduct even if the target of an investigation or action to be filed was innocent.'" *U.S. ex rel. Sanchez v. Lymphatx, Inc.,* 596 F.3d 1300, 1303 n.6 (11th Cir. 2010) (quoting *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson,* 545 U.S. 409, 416 (2005)).

must demonstrate that they had a reasonable belief that Spirit of Athens violated the FCA. *Roberts v. Rayonier, Inc.,* 135 Fed. Appx. 351, 357 (11th Cir. 2005).

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful [FCA] practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Roberts*, 135 Fed. Appx. at 357 (quoting *Little v. United Techs.,* 103 F.3d 956, 960 (11th Cir. 1997)) (using retaliation principles from race retaliation decision to evaluate ADA retaliation claim) (emphasis in *Roberts*).

> "The objective reasonableness of an employee's belief that her employer has engaged in an unlawful [] practice [under the FCA] must be measured against existing substantive law." *Clover v. Total System Services, Inc.,* 176 F.3d 1346, 1351 (11th Cir. 1999); *Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1388 n.2 (11th Cir. 1998). Where "reasonable minds could disagree on" the reasonableness of a plaintiff's belief, the issue is "an inappropriate candidate for judgment as a matter of law." *Lipphardt v. Durango Steakhouse of Brandon, Inc.,* 267 F.3d 1183, 1187 (11th Cir. 2001).

*Roberts*, 135 Fed. Appx. at 357-58; *see also McCrary*, 200 F. Supp. 3d at 790 (in an FCA retaliation action, "for conduct to be considered protected, it must be shown that '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'") (quoting *Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004)).

12

Here, in light of existing substantive law, neither Ms. Hickman nor Ms. Hines could have reasonably believed that Spirit of Athens engaged in conduct that violated the FCA because "for the FCA to apply, a false claim must be made or contemplated, whether it be to the federal government directly or to an entity that will pay the claim with federal funds." *McCrary*, 200 F. Supp. 3d at 791. Assuming for argument's sake that the TVA's statutory in-lieu-of-taxes payments to the State of Alabama constitute "federal funds" within the meaning of the FCA, the record makes plain that Spirit of Athens did not submit a claim or supply false information to the TVA, the State of Alabama, or Limestone County to obtain the in-lieu-of-taxes funds.[6] The State of Alabama received the "in-lieu-of-taxes" funds from the TVA pursuant to 16 U.S.C. § 831*l* , and the State of Alabama allotted $5,000 of those funds to Limestone County for the Spirit of Athens at the direction of the Alabama Legislature. (Doc. 27-1, p. 11, tpp. 39-42; Doc. 27-1, p. 49 (in pp. 45-51); Doc. 27-1, p. 56 (in pp. 52-62)). Ms. Hickman understood that the TVA did not restrict the way in which Spirit of Athens used the in-lieu-of-taxes funds, and the TVA did not require an accounting of the expenditure of those funds.

---

[6] As noted above, the TVA no longer receives federal funds. The federal corporation is "fully self-financing, funding virtually all operations through electricity sales and power system bond financing." *See* p. 6, *supra*. The Court has found no authority that suggests that funds earned by a federal corporation, as opposed to funds appropriated to a federal corporation from the federal government, constitute "federal funds" for purposes of the FCA. And in-lieu-of-taxes funds are the analog of taxes that a private energy producer would have to remit to a state for income received from sales of its product in the state. In-lieu-of-taxes funds do not resemble federal appropriations in form or substance.

Under existing substantive law, Spirit of Athens's mere receipt of the TVA funds does not give rise to a potential FCA violation. If either Ms. Hickman or Ms. Hines believed otherwise, the belief was unreasonable as a matter of law.

The plaintiff's retaliation theory in *McCrary* was much like the plaintiffs' theory in this case. In *McCrary*, the plaintiff was an employee of a county highway department. 200 F. Supp. 3d at 787. In his complaint, Mr. McCrary alleged that the county was misusing funds and other resources. Mr. McCrary asserted that the county:

> receive[d] Federal funds and funds from the State of Indiana that are specifically designated and dedicated for use by the Knox County Highway Department. This includes Federal and Indiana funds for road repair, road construction, bridge repair, bridge construction and purchase of equipment and materials by the Knox County Highway Department.

*McCrary*, 200 F.Supp.3d at 792. In its opinion dismissing Mr. McCrary's complaint, the district court explained that Mr. McCrary did not allege conduct prohibited by the FCA because Mr. McCrary did not allege that the county used the federal funds that it received "to advance a federal government program or interest, or that the federal government will be responsible for paying or reimbursing any portion of the costs associated with the allegedly fraudulent grading job." 200 F. Supp. 3d at 792. The district court held that Mr. McCrary's "vague allegation that Knox County receives some federal funding is not enough to bring his retaliation claim within the purview of the FCA." 200 F. Supp. 3d at 792.

14

Moreover, Mr. McCrary did not allege that the county submitted a claim to an entity to obtain federal funds. The district court stated:

> Here, Mr. McCrary alleges only that Knox County receives some federal funding. He does not allege that Knox County would or did submit any type of claim to the federal government for reimbursement relating to grading the road at issue. For example, he does not allege that Defendants were preparing, or causing someone to prepare, false financial or other records that would be submitted to the federal government. Again, merely alleging that Knox County receives some federal funding—without tying that funding to grading the county road and a subsequent claim—is insufficient to allege retaliation under the FCA.

200 F. Supp. 3d at 793 (citation to the district court record omitted).

Last but not least, because Mr. McCrary did not allege fraudulent conduct in relation to the submission of a claim for federal funds, he did not assert the type of fraud that the FCA prohibits. In the words of the *McCrary* court:

> The FCA attaches liability for specific acts of fraud; it does not seek to punish fraud in a general sense. . . . It may well be true that the misconduct Mr. McCrary alleges—that is, the misuse of Knox County funds in the grading of a private road—fits some definition of "fraud," or is otherwise unlawful. However, that does not mean that Mr. McCrary is entitled to a remedy under the FCA whistleblower provision. As discussed above, Mr. McCrary does not allege that a false claim for payment or reimbursement was ever made to the federal government or to a grantee thereof. In fact, he does not assert that a false claim was or would be made to any federal entity at all.

200 F. Supp. 3d at 793-94 (citation to the district court record omitted). The district court observed that Mr. McCrary "frames the misconduct he was allegedly terminated for reporting not as fraud against the federal government—which is the

15

focus of the FCA—but as another type of fraud against a local government. Thus, Mr. McCrary's allegations regarding illegal conduct of the Defendants are outside the purview of the FCA, as is retaliation based on those allegations." 200 F. Supp. 3d at 794.

The analysis in *McCrary* applies fully to the theory of fraud that Ms. Hickman and Ms. Hines pursue against Spirit of Athens. The plaintiffs allege that they "were attempting to bring transparency and accountability to this non-profit corporation that receives federal and other funds and they were fired for it." (Doc. 1, p. 2). They report that when Ms. Hines joined Spirit of Athens and began reviewing the organization's membership records, she found "troubling financial discrepancies." (Doc. 1, p. 8, ¶¶ 34-35). Ms. Hickman refused to sign the organization's federal and state tax returns because they were "based on less-than-complete information created" by the organization's previous Executive Director. (Doc. 1, p. 9, ¶ 38). Ms. Hickman and Ms. Hines shared their concerns about the organization's financial records with the Executive Board of the Spirit of Athens. (Doc. 1, p. 9, ¶¶ 40-42). A few weeks after Ms. Hickman and Ms. Hines disclosed their concerns to the Executive Board, the Chairman of the Limestone County Commission contacted Ms. Hickman to request accounting information for Spirit of Athens. (Doc. 1, p. 10, ¶ 48). The plaintiffs assert that they were terminated "in an effort to conceal" that Spirit of Athens "had misused and/or mismanaged funds,

16

at least some of which constituted funds from the federal government via one or more grants provided by the TVA" and "in an effort to conceal" that Spirit of Athens's "tax returns were drafted with insufficient information." (Doc. 1, pp. 12-13, ¶¶ 59-60). Finally, Ms. Hickman and Ms. Hines allege that Spirit of Athens fired them because they were in the process of revealing the Spirit of Athens had "knowingly made or caused to be made false records and/or statements material relative to the appropriate accounting for certain federal funds." (Doc. 1, p. 15, ¶ 74).

Like Mr. McCrary, Ms. Hickman and Ms. Hines have not alleged that Spirit of Athens used TVA in-lieu-of-taxes funds to advance a federal government program or interest or that Spirit of Athens would have to use federal funds to make up potential shortages due to accounting irregularities. Like Mr. McCrary, Ms. Hickman's and Ms. Hines's "vague allegation that [Spirit of Athens] receives some federal funding is not enough to bring [the plaintiffs'] retaliation claim within the purview of the FCA." 200 F. Supp. 3d at 792.

Moreover, like Mr. McCrary, Ms. Hickman and Ms. Hines have not alleged that Spirit of Athens submitted a claim to an entity to obtain federal funds. The plaintiffs:

> allege[] only that [Spirit of Athens] receives some federal funding. [The plaintiffs] do[] not allege that [Spirit of Athens] would or did submit any type of claim to the federal government for reimbursement.

17

200 F. Supp. 3d at 793. Ms. Hickman acknowledged in her deposition that under "the law," the TVA "would distribute the money to Spirit of Athens. So it wasn't something we had – that I had any – to go back to fill out any paperwork to say we are needing this money, we are asking for appropriations for that." (Doc. 27-1, pp. 9-10, tpp. 32-33).

Last but not least, like Mr. McCrary, because Ms. Hickman and Ms. Hines do not allege fraudulent conduct in relation to the submission of a claim for federal funds, they do not assert the type of fraud that the FCA prohibits.

> The FCA attaches liability for specific acts of fraud; it does not seek to punish fraud in a general sense . . . It may well be true that the misconduct [that Ms. Hickman and Ms. Hines allege[] . . . fits some definition of "fraud," or is otherwise unlawful. However, that does not mean that [the plaintiffs are] entitled to a remedy under the FCA whistleblower provision. As discussed above, [Ms. Hickman and Ms. Hines do not] allege that a false claim for payment or reimbursement was ever made to the federal government or to a grantee thereof. In fact, [they] do[] not assert that a false claim was or would be made to any federal entity at all.

200 F. Supp. 3d at 793-94 (citation to the district court record omitted). The misconduct that Ms. Hickman and Ms. Hines describe may amount to tax fraud against the United States or the State of Alabama or to some form of fraud against Limestone County, but that conduct is outside of the purview of the FCA and thus outside of the scope of an FCA retaliation claim.

Had Ms. Hickman or Ms. Hines alleged that Spirit of Athens somehow submitted false information to an entity to apply for TVA funds, the record establishes that TVA in-lieu-of-taxes funds are funds that the TVA must pay to the State of Alabama, and the Alabama Legislature determines the manner in which the funds are distributed within the State of Alabama. If there were an application for funds, the application would have to be made to the State of Alabama. Thus, the conduct in this case is even further removed from the field of operation of the FCA than the conduct at issue in *McCrary*.

Accordingly, as a matter of law, Ms. Hickman and Ms. Hines cannot demonstrate that they engaged in protected conduct under the FCA such that they can establish a prima facie case of retaliation. Although the allegations surrounding Spirit of Athens's financial operations are serious, and Ms. Hickman and Ms. Hines may have lost their jobs because they were on the brink of exposing fraudulent or illegal conduct, that misconduct does not fall within the scope of the FCA's prohibition on the submission of a false claim as a means of obtaining federal funds.

## IV. CONCLUSION

For the reasons stated above, the Court grants Spirit of Athens's motion for summary judgment. The Court will enter a separate order closing the case.

**DONE** this 22nd day of February, 2019.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE